IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEUROGRAFIX, NEUROGRAPHY INSTITUTE MEDICAL ASSOCIATES, INC. IMAGE-BASED SURGICENTER CORPORATION, and AARON G. FILLER,<br><br>Plaintiffs,<br><br>vs.<br><br>BRAINLAB, INC., BRAINLAB AG, BRAINLAB MEDIZINISCHE COMPUTERSYSTEME GMBH,<br><br>Defendants. | Case No. 12 C 6075 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

U.S. Patent No. 5,560,360 describes methods and systems for creating images of neural tissues by using diffusion tensor imaging (DTI), an application of magnetic resonance imaging (MRI) technology. The plaintiffs—NeuroGrafix, Neurography Institute Medical Associates, Inc. (NIMA), Image-Based Surgicenter Corporation (IBSC), and Dr. Aaron G. Filler—have sued the defendants—Brainlab, Inc., Brainlab AG, and Brainlab Medizinische Computersysteme GmbH (collectively, Brainlab)—for infringement of the '360 patent. The case was consolidated with cases filed against other defendants for pretrial proceedings in a multidistrict litigation (MDL) proceeding.

While the case was before the MDL transferee judge, Brainlab moved for summary judgment on the issues of infringement and lost profits damages and to exclude the plaintiffs' expert opinions on damages. The MDL judge granted summary

judgment of non-infringement in favor of Brainlab and terminated as moot Brainlab's motions for summary judgment on lost profits and to exclude the plaintiffs' expert opinions on damages. *In re Neurografix ('360) Patent Litig.*, No. 13 MDL 2432-RGS, 2018 WL 2392000, at *5 (D. Mass. May 25, 2018), *rev'd sub nom. NeuroGrafix v. Brainlab, Inc.*, 787 F. App'x 710 (Fed. Cir. 2019). The court denied reconsideration and remanded the case to this Court, and this Court also denied reconsideration on the non-infringement question. The plaintiffs appealed, and the Federal Circuit reversed the MDL court's grant of summary judgment on the non-infringement issue and remanded the case to this Court for further proceedings. *See NeuroGrafix*, 787 F. App'x at 719–20.

As a result of the Federal Circuit's reversal, Brainlab's motions for summary judgment on lost profit damages and to exclude expert opinions on damages are no longer moot. The Court gave the parties leave to file supplemental briefs on the question of lost profits. For the reasons stated below, the Court grants summary judgment with respect to lost profits in favor of Brainlab and terminates as moot Brainlab's motion to exclude the plaintiffs' expert opinions.

**Background**

The Court assumes familiarity with this case's factual background and procedural history, which the MDL transferee judge and Federal Circuit have described in their written opinions. *See NeuroGrafix*, 787 F. App'x at 711–16; *In re Neurografix*, 2018 WL 2392000, at *1–2; *In re Neurografix ('360) Patent Litig.*, 201 F. Supp. 3d 206, 209–12 (D. Mass. 2016) (MDL court's claim construction).

The following facts are relevant for the purposes of the present order.

NeuroGrafix, IBSC, and NIMA are separate corporations in the medical imaging field. Dr. Filler is a co-inventor of the method described in the '360 patent, the holder of the patent, the CEO of NeuroGrafix, the president of IBSC, and the designated representative of NIMA. The plaintiffs contend that NeuroGrafix has an exclusive license to the '360 patent's rights in the field of non-human, non-surgical medicine; NIMA has such a license in the field of human, non-surgical medicine; and IBSC has one in the field of human, surgical medicine.

Brainlab sells a software called FiberTracking to hospitals. Surgeons can use FiberTracking to process data from MRI scans and, through a technique called DTI tractography, to create images of neural tracts in brains. Surgeons can create these images in real time, enabling them to obtain information and guidance while they perform brain surgeries. The parties dispute whether Brainlab, through its FiberTracking software, infringed or induced infringement of the '360 patent. The plaintiffs seek damages based on profits they contend they lost due to Brainlab's alleged infringement or induced infringement.

A written business plan from 2000 described NeuroGrafix's intentions to establish itself as the "first" Internet-based, national-scale "medical specialty practice." [1] Defs.' Ex. O, 13 MD 02432-RGS, dkt. no. 459-16, at 8.[2] It stated that NeuroGrafix intended to "pursue negotiations directed towards options and licenses in four areas," including "the

---

[1] In 2000, it appears, NeuroGrafix's license over the '360 patent's rights was not limited to non-human, non-surgical medicine.

[2] Except for their supplemental briefs and the exhibits attached thereto, the parties filed all briefs and evidence at issue in this order in the MDL proceedings. When citing to docket entries from those proceedings, the Court includes the case number from the MDL court.

3

use of Neurography in image guided surgery." *Id.* at 31; *see also id.* at 63–64. It also described another aspect of NeuroGrafix's proposed business model: NeuroGrafix would establish around 20 medical imaging centers in urban areas, lease "scanner time" at those facilities, *id.* at 60, and process the data from these scans. No evidence in the record indicates that NeuroGrafix carried out this business plan, however.

In May 2009, Dr. Filler e-mailed three of Brainlab's executives an offer to grant them a license or exclusive license relating to rights under the patent for DTI tractographies. Later that month, a manager at Brainlab e-mailed Dr. Filler and stated that Brainlab was not interested in the offer.

A 2010 written business plan for ISBC described the company's aspirations to develop specialized, "multi-function" facilities for the "diagnostic and interventional use of" neurography and DTI tractography. Defs.' Ex. P, 13 MD 02432-RGS, dkt. no. 459-17, at 2. According to the plan, these facilities would have on-site MRI systems that would enable the performance of real-time "MRI guided" surgery for "spine, nerve, small tumor excisional biopsy, and orthopedic procedures." *Id.* at 4. They also would have general operating rooms for "non-MRI procedures" and waiting rooms described as a "spa-facilit[ies]." *Id.* at 2. The plan stated that ISBC would need three physicians to base their primary practices at each of the facilities and that ISBC could earn more money from surgeries "[i]f outside physicians [could] be encouraged to use the facilit[ies]." *Id.* at 6. Nothing in the record indicates, however, that ISBC established these facilities.

The 2010 business plan did not state that ISBC planned to offer a remote, real-time DTI tractography service to surgeons conducting brain surgeries at hospitals. Dr.

4

Filler testified that ISBC planned to perform intraoperative tractographies for brain surgeries by providing a service through which surgeons would electronically transport data to IBSC while performing surgeries at hospitals. IBSC would process the data, perform the DTI tractographies, and send the results back to the surgeons in real time. Dr. Filler testified, however, that ISBC does not, and has never, provided such a service. The plaintiffs' expert, John E. Elmore, testified that the ISBC's business plan had a "continuing evolution" and that Dr. Filler had "ideas" about how to develop this imaging service. Elmore Dep., Defs.' Ex. N, 13 MD 02432-RGS, dkt. no. 459-15, at 84:21–84:10. Elmore also testified that that ISBC never sent a proposal regarding this service to any customers.

According to the plaintiffs, NIMA has a neuroimaging practice that includes the provision of "interpretative diagnostic advice" based on NIMA's interpretations of DTIs from brain MRIs. Pls.' Resp., 13 MD 02432-RGS, dkt. no 464, at 12. As evidence of the amount NIMA charges its customers for such a service, the plaintiffs point to three checks issued to NIMA. According to Dr. Filler's testimony, the checks were written by lawyers whose clients had head injuries and needed neuroimages as evidence in their court proceedings. NIMA does not provide a real-time DTI tractography service for use during brain surgeries.

## Discussion

A party is entitled to summary judgment only if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. There is a genuine issue of material fact precluding summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

5

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019).

**A.     Lost profits**

Brainlab has moved for summary judgment regarding the plaintiffs' entitlement to damages based on lost profits. "[T]he availability of lost profits is a question of law for the court." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007). "To recover lost profits, the patent owner must show causation in fact, establishing that but for the infringement, he would have made additional profits." *Id.* (internal quotation marks omitted).

As an initial matter, the plaintiffs requested leave to file supplemental briefing on the issue of lost profits but spent most of their supplemental brief on arguments relating to the issue of infringement. In granting leave to file supplemental briefs, as indicated, the Court informed the parties that the Court would consider only the issues the MDL transferee judge had deemed moot and would not address the prior motion for summary judgment on the issue of infringement. Therefore, the Court will not address the plaintiffs' arguments regarding infringement.[3]

Brainlab argues first that the plaintiffs cannot seek damages based on lost profits because they sought to license the rights under the patent rather than to sell a product

---

[3] To the extent the plaintiffs contend that their arguments relating to infringement help them to establish their entitlement to lost profits, that is incorrect as a matter of law. *See, e.g.*, *Wechsler*, 486 F.3d at 1293.

6

or service. "When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996); *see also Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir.1990) (a patentee could not seek damages on the basis of lost profits where he licensed the system covered by his patent but did not sell a product incorporating that system).

It is undisputed that the plaintiffs sought to license the rights under the patent. In May 2009, Dr. Filler e-mailed three of Brainlab's executives, offering to grant them a license or exclusive license to all rights under the patent, and an IP manager at Brainlab informed Dr. Filler that Brainlab was not interested in his offer. Further, NeuroGrafix's 2000 business plan stated that it planned to "pursue negotiations directed towards options and licenses in four areas," including "the use of Neurography in image guided surgery." Defs.' Ex. O, 13 MD 02432-RGS, dkt. no. 459-16, at 31. Indeed, in their brief opposing summary judgment on the issue of lost profits, the plaintiffs contend that Brainlab "should have" licensed the rights under the patent from them. Pls.' Resp., 13 MD 02432-RGS, dkt. no. 464, at 8.

The plaintiffs argue that, despite their focus on licensing, they are entitled to lost profits because they had the ability to provide a DTI tractography service involving the patented method, but Brainlab "blocked" them from entering the relevant market. *Id.* at 14. The court in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), articulated a test by which a plaintiff may prove but-for causation and thus entitlement to lost profit damages. *See id.* at 1156. Under the *Panduit* test, the patentee must show: "(1) demand for the patented product; (2) an absence of

7

acceptable, noninfringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (citing *Panduit*, 575 F.2d at 1156). Summary judgment is appropriate if the patentee relies on the *Panduit* test but cannot establish one of its elements. *See, e.g.*, *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551–52 (Fed. Cir. 1994).

The plaintiffs are not entitled to lost profits because they offer no evidence to satisfy the third element of the *Panduit* test. Because the plaintiffs did not sell a product, they must show that they had "the ability to manufacture and market a product, but for some legitimate reason [did] not." *Wechsler*, 486 F.3d at 1293. "[T]he burden on a patentee who has not begun to manufacture the patented product is commensurately heavy." *Id.* Further, the patentees' plans to manufacture a product may not be speculative. *Hebert*, 99 F.3d at 1119. In *Kearns,* for example, the Federal Circuit affirmed a district court's grant of summary judgment on the issue of lost profits where the patentee's plans to manufacture windshield wipers were "tentative, speculative, and contingent," and the patentee put forth no evidence that he had ever sold the wipers or had the manufacturing capability to do so. *Kearns*, 32 F.3d at 1551–52 (quoting the district court's opinion).

The plaintiffs contend that they planned for ISBC to provide interoperative tractographies through a service where surgeons performing brain surgeries would electronically send to IBSC data from MRI scans. In real time, IBSC would process the data, perform the tractographies, and send the results back to the surgeons. As with the patentee in *Kearns*, however, the plaintiffs' evidence of their plans to design such a

8

service is too speculative to permit a reasonable jury to find in their favor on this point. ISBC's 2010 business plan described its aspirations to develop specialized, "multi-function" facilities for the "diagnostic and interventional use of" neurographies and DTI tractographies. Defs.' Ex. P, 13 MD 02432-RGS, dkt. no. 459-17, at 2. The business plan did not indicate that ISBC planned to offer a remote DTI tractography service to surgeons at hospitals. Nor did it indicate that ISBC planned to provide any such service for brain surgeries. The plaintiffs' expert stated that the ISBC's business plan had a "continuing evolution" and that Dr. Filler had "ideas" about how to develop this service. Elmore Dep., Defs.' Ex. N, 13 MD 02432-RGS, dkt. no. 459-15, at 84:21–84:10. But the expert provided no concrete details about those ideas or ISBC's ability to develop them into a marketable service; indeed, he testified that ISBC had never sent a proposal regarding a remote DTI tractography service to any customers. And Dr. Filler's testimony about those plans provided no indication that ISBC would have taken steps to provide such a service but for Brainlab's alleged infringement. In short, the plaintiffs offer no evidence that they had anything other than speculative plans to provide an intraoperative DTI tractography service.

Nor have the plaintiffs offered evidence that would permit a finding that ISBC had the ability to develop and market such a service. ISBC has never provided intraoperative tractographies, and it has pointed to no evidence that it possesses the software necessary for analysts to perform real-time intraoperative tractographies. It would need to use Brainlab's software to perform the requisite analysis, but it has never bought or licensed the software or entered into a contract with a customer who has done so. The plaintiffs contend that ISBC had the capability to provide intraoperative

9

tractographies because NIMA had experience processing and preparing data for tractographies. But although the plaintiffs contend that NIMA has processed such data "in thousands of cases," Pls.' Resp., 13 MD 02432-RGS, dkt. no. 464, at 10, they provided only three checks as evidence of NIMA's ability to meet the market needs. All three checks were written by lawyers who apparently paid NIMA to process data relating to lawsuits. The plaintiffs point to no evidence that NIMA ever remotely processed and prepared data for tractographies during brain surgeries performed in hospitals, the service for which they contend they should be entitled to lost profits, let alone that NIMA could provide and market such a service. And even if NIMA was able to process and prepare data for tractographies, the plaintiffs point to no evidence of concrete plans to apply that capability to develop a service provided by ISBC, nor that ISBC itself had the resources to provide that service. In sum, there is no evidence that the plaintiffs had the manufacturing and marketing capability to meet the demand of the brain DTI tractography market, and thus no evidence to support their entitlement to lost profit damages under the third *Panduit* factor. Accordingly, the Court need not address the parties' arguments regarding the other *Panduit* factors.[4] *See, e.g.*, *Kearns*, 32 F.3d at 1551–52.

      The *Panduit* test is not the exclusive way for a patentee to show a reasonable

---

[4] The Court also need not address Brainlab's argument that that the plaintiffs cannot show but-for causation because they did not plan to sell the same products or services as Brainlab but instead intended to use Brainlab's software to perform the patented method. Implicit in this argument is a contention that the plaintiffs cannot show a demand for the patented product and an absence of acceptable, non-infringing substitutes—the first two factors of the Panduit test. *See BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) ("If the patentee's and the infringer's products are not substitutes in a competitive market, Panduit 's first two factors do not meet the 'but for' test—a prerequisite for lost profits.").

probability that the infringer caused it to lose profits. *See, e.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) ("A patentee may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement."). But the Court need not address whether another approach, such as the two-supplier market test, proves causation in this case, because the plaintiffs have made no alternative arguments. Regardless, the plaintiffs cannot prove causation through the two-supplier market test. Under that test, a court may assume that, in a market where there are only two suppliers, a patentee would have made the infringer's sales, "provided the patent owner has the manufacturing and marketing capabilities." *Id.* at 1124. As indicated, the plaintiffs have not shown that they had had their "own manufacturing and marketing capability," *id.*, and thus they cannot establish causation under the two-supplier market test.

In sum, the plaintiffs have offered no evidence that would permit a reasonable jury to find that they are entitled to lost profits. The Court therefore grants Brainlab's motion for summary judgment on this point.

**B.     Expert evidence**

Brainlab has also moved to exclude the opinions of the plaintiffs' experts, Dr. Filler and Elmore, on damages. Brainlab primarily argues that the Court should exclude Dr. Filler's and Elmore's calculations of the amount of lost profits. As just indicated, the Court has granted summary judgment on the issue of lost profits. In granting that motion, the Court has not considered the experts' opinions regarding the amount of lost profits to which the plaintiffs claimed to be entitled. Accordingly, Brainlab's arguments that those opinions should be excluded are moot.

The remainder of the parties' briefs address whether the Court should exclude Dr. Filler's and Elmore's opinions on the issue of reasonable royalties.  Because no motion relating to reasonable royalties is before the Court at this time, the Court will not consider whether to exclude Dr. Filler's and Elmore's opinions on that issue.  To the extent Brainlab contends that Dr. Filler's and Elmore's opinions should be excluded at trial, that is a matter more appropriately determined at a later stage of this case.  Brainlab may, if it wishes, refile this motion as a motion *in limine* at the appropriate time.

**Conclusion**

For the foregoing reasons, the Court grants Brainlab's motion for summary judgment on the issue of lost profits [13 MD 02432-RGS, dkt. no. 455] and denies as moot Brainlab's motion to exclude expert opinions [13 MD 02432-RGS, dkt. no. 460].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 30, 2020