**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **NEUROGRAFIX, NEUROGRAPHY** | ) | |
| **INSTITUTE MEDICAL ASSOCIATES, INC.,** | ) | |
| **IMAGE-BASED SURGICENTER** | ) | |
| **CORPORATION, and AARON G. FILLER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12 C 6075** |
| | ) | |
| **BRAINLAB, INC., BRAINLAB AG,** | ) | |
| **BRAINLAB MEDIZINISCHE** | ) | |
| **COMPUTERSYSTEME GMBH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiffs NeuroGrafix, Neurography Institute Medical Associates, Inc. (NIMA),

Image-Based Surgicenter Corp (IBSC), and Dr. Aaron Filler have moved the Court to

certify for interlocutory appeal under 28 U.S.C. § 1292(b) the Court's January 30, 2020

decision granting the motion of defendants Brainlab, Inc., Brainlab AG, and Brainlab

Medizinische Computersysteme GmbH for summary judgment of no lost profits,

*NeuroGrafix v. Brainlab, Inc.* ("Jan. 30, 2020 Order"), No. 12 C 6075, 2020 WL 489529

(N.D. Ill. Jan. 30, 2020), and the Court's February 26, 2020 decision denying plaintiffs'

motion for reconsideration of the January 30 decision, *NeuroGrafix v. Brainlab, Inc.*

("Feb. 26, 2020 Order"), No. 12 C 6075, 2020 WL 919004 (N.D. Ill. Feb. 26, 2020).

Familiarity with these rulings is assumed.

In the January 30 decision, this Court determined that plaintiff had pointed to no

evidence that would satisfy a critical requirement of the standard for recovery of lost profits: the "manufacturing and marketing ability to exploit the demand" for a product—the third requirement under *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978), for recovery of lost profits. Jan. 30, 2020 Order, 2020 WL 489529, at *4. The Court addressed this issue separately with regard to IBSC and NIMA, concluding that no reasonable jury could find either is entitled to lost profits. *Id.* at *4–5. On reconsideration, plaintiffs contended that the Court had overlooked one of their arguments. The Court concluded that plaintiffs had not, in fact, advanced this argument, and that even if they had, it was unsupported by evidence. Feb. 26, 2020 Order, 2020 WL 919004, at *1–2.

In the order denying reconsideration, the Court also addressed, among other things, plaintiffs' apparent contention that they were not on notice that plaintiff NIMA's claim for lost profits was at issue on the summary judgment motion:

> To the extent the plaintiffs contend that they could have provided more evidence showing NIMA's lost profits but lacked notice that the preoperative tractographies were at issue, that argument is unavailing. The defendants' motion for summary judgment covered the entirety of plaintiffs' request for lost profits, even though the discussion focused on interoperative tractographies. If, as plaintiffs contend, preoperative tractographies were a substantial source of their claimed lost profits, it was incumbent upon them to point this out in their response to defendants' motion and/or in their supplemental brief filed following remand [from the MDL transferee court].

*Id.* at *2.

## Discussion

In considering plaintiffs' motion for certification under section 1292(b), the Court "keep[s] in mind that '[i]t has ... long been the policy of the courts to discourage piece-meal appeals because most often such appeals result in additional burdens on both the

court and the litigants,' and thus permissions for interlocutory appeals should be 'granted sparingly and with discrimination.'" *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 450 F. App'x 978, 979 (Fed. Cir. 2011) (quoting *Union County v. Piper Jaffray & Co.,* 525 F.3d 643, 646 (8th Cir. 2008)). Section 1292(b) establishes three criteria for certification. "The court must be of the opinion that: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) certification will materially advance the ultimate termination of the litigation." *Green Edge Enters.*, 450 F. App'x at 979.

In seeking an interlocutory appeal, plaintiffs contend that the Court's decision involves the following "question of law": "whether it was proper for the district court to grant summary judgment based upon an issue raised *sua sponte* without providing the responding party either notice or an opportunity to respond." Pls.' Mem. (dkt. 234) at 4-5. This issue, plaintiffs say, can be decided "quickly and cleanly *without the appellate court having to study the district court record.*" *Id.* at 5 (emphasis added).

Plaintiffs' contention, as the Court will discuss, is based on a false premise: that the Court raised an issue *sua sponte* and ruled on it without plaintiffs having had a chance to address the issue. One way or another, however, to assess plaintiffs' contention, examination of the record *would* be required: how could the appellate court determine whether this Court actually raised an issue *sua sponte* without looking at the record? In short, contrary to plaintiffs' contention, the issue raised involves questions of fact, including whether defendants raised the issue, whether the Court raised it *sua sponte*, and whether plaintiffs were on notice that *all* plaintiffs' lost profits were placed at issue by defendants' motion.

Despite this, the Court will assume for purposes of discussion that plaintiffs' motion does, in fact, involve a "question of law." Even if so, plaintiffs' motion founders on the second requirement for certification under section 1292(b)—the need to show a substantial ground for difference of opinion regarding the issue.

The specific issue that plaintiffs contend the Court raised *sua sponte* was plaintiff NIMA's entitlement to lost profits. Plaintiffs contend that defendants never contended in their motion that NIMA was not entitled to lost profits and thus that they never had an opportunity to address it.[1] Both contentions are demonstrably false. Although defendants did not single out NIMA in their brief in what they entitled their "motion for summary judgment of no lost profits damages," the brief specifically referred to "plaintiffs" in the plural, not just ISBC or NeuroGrafix, a clear signal that defendants were challenging all three plaintiffs' requests for lost profits. *See, e.g.*, Defs.' Mem. in Supp. of Mot. for Summ. J. on Lost Profits, 13 MD 02432-RGS, dkt. no. 458, at 1 ("Plaintiffs cannot prove they had the capacity to replace Brainlab in the market . . . Plaintiffs cannot quantify the income they have supposedly lost."), 7 ("Plaintiffs would not and could not have made a penny of profit."), 8 ("Plaintiffs here cannot prove entitlement to lost profits for a few very simple reasons."), 13 ("Dr. Filler does not identify any legitimate reason why IBSC *or any other plaintiff* never tried to compete in the market. . . . Simply put, none of the Plaintiff companies has ever sold the service for

---

[1] The parties dispute whether and the extent to which NIMA's lost profits were addressed during discovery. The Court need not weigh in on that dispute, because it is not the issue here. Rather, the question before the Court involves defendants' summary judgment motion and whether the Court raised and decided *sua sponte* a question not put in issue by the motion. For this reason, the Court will focus on the summary judgment motion and briefs, not the discovery.

which it now seeks lost profits." (emphasis added)), 14 ("Plaintiffs suffered no damages as a result of Brainlab's accused infringement.").  And the concluding sentence of the brief stated that "[a]ccordingly, Brainlab asks the Court to grant summary judgment *that no lost profits are available to Plaintiffs*.")  *Id.* at 14 (emphasis added).

Contrary to plaintiffs' current protestations, the record reflects they, too, understood defendants' motion to challenge *all plaintiffs'* entitlement to recover lost profits.  *See, e.g.*, Pls.' Memo. in Opp. to Defs.' Mot. for Summ. J. on Lost Profits, 13 MD 02432-RGS, dkt. no. 464, at 21 ("[The] *NeuroGrafix Parties* have provided competent evidence to support and prove a prima facie case for Lost Profits Damages because they can prove they meet the four Panduit factors." (emphasis added)); *see also id.* at 4 (referring to plaintiffs collectively as the "NeuroGrafix Parties" and "NGFX"), 6 (discussing "the financial impact of infringement on NGFX's profits"); 7 (heading titled, "The Substance of the Infringement Causing Lost Profits to the NeuroGrafix Parties"), 14 ("Therefore, the NeuroGrafix Parties have shown they are capable of providing the service and meeting the demand.").  Perhaps more to the point, to the extent plaintiffs contend they had no opportunity to address NIMA's ability to perform tractographies— and thereby to establish one of the criteria for recovery of lost profits—they expressly addressed that point without distinguishing between their claims to lost profits for preoperative versus intraoperative tractographies.  *See id.* at 4 ("The operations of NIMA are proof of the ability of the NeuroGrafix Parties ("NGFX") capability to offer the services at issue."), 10 (suggesting that "NIMA and/or IBSC" could "offer [an] enhanced service of DTT production" by "handl[ing] the scan process" and stating that the "lease payment from NIMA or ISBC to [a] hospital [for leased scanner time] is about equal to

5

the amount *they* would receive if they, e.g. billed Medicare for the *intraoperative* MRI" (emphasis added)).  Indeed, in a section of their brief titled "Basis for Finding Lost Profits," *id.* at 13, plaintiffs expressly discussed the third requirement of *Panduit* and stated that "NIMA showed it could develop a flexible, extensible model of providing *the exact services at issue*," *id.* at 14—without providing any indication they did not believe NIMA's services, let alone its lost profits, to be at issue on the pending motion.

Plaintiffs also expressly asserted, in responding to defendants' summary judgment motion, NIMA's ability to offer DTI processing with respect to the third *Panduit* factor by arguing that ISBC would have used NIMA's processes to offer DTI processing. Specifically, plaintiffs argued that because NIMA had used the applicable methodology in thousands of cases, ISBC could use that methodology.  *See id.* at 10 ("The methodology that NIMA has used in thousands of cases since 2001 is the same methodology that IBSC would use for this component of the service."), 12 ("IBSC was obviously fully capable of providing the service because it uses the same servers, workstations, staff and physician services as NIMA, which has made NIMA one of the leading providers of brain DTT services in the United States.  These services would be under the IBSC label because IBSC is configured to provide surgical advice based on the image data it processes while NIMA is configured to provide image interpretive diagnostic advice from the same services.  The suggestion that these same resources and individuals who have extensive experience successfully operating a remotely distributed electronic neuroimaging service for NIMA—obtaining brain DTI scans, then carrying out tractography, on leased scanner time throughout the United States and in Europe—have not proven they are capable of doing the same things when working

under the IBSC brand is nonsense."), 14 ("Although IBSC and NIMA are separate corporations with different regulatory requirements, the technology delivery component is identical between the two entities.").[2] For these reasons, plaintiffs have not made the showing of contestability required for certification under section 1292(b).

Finally, the Court is highly skeptical that allowing an interlocutory appeal will materially advance the ultimate termination of the litigation. The case is set for a jury trial in June, and the Court intends to proceed with it at that time (unless, of course, the current Coronavirus crisis makes this impossible). An interlocutory appeal—including the time needed to brief the 1292(b) issue before the Federal Circuit, the time for that court to decide whether to take the case, the time needed to brief the merits (if the court permits separate merits briefing), and the time needed for argument and decision— would unquestionably force cancellation of the trial date and likely would delay the completion of the case before this Court by nine to twelve months. The Court acknowledges plaintiffs' contention that a reversal on this point might necessitate a new trial, but if that is an argument for interlocutory appeal, it proves too much. The same would be true of *any* interlocutory ruling that has the effect of excluding evidence or barring a claim, thus necessitating interlocutory appeals for a whole range of pretrial

---

[2] The Court also notes that plaintiffs relied upon NIMA's claimed profits to attempt to demonstrate the fourth element of the Panduit test—the amount of profits lost. (The Court did not address that element in its discussion). *See id.* at 14 (stating that "NIMA collects about $4,000 for each scan," and contending that amount "is the reasonable per scan profit"), 15 (contending that Dr. Filler's testimony and the copies of checks made out to NIMA show "that NIMA is actively in the business of providing DTT services through a distributed electronic network and is paid the amounts asserted" and establish that plaintiffs satisfy the *Panduit* test). Additionally, contrary to plaintiffs' contention that defendants have not challenged any evidence provided by NIMA, defendants argued that the checks did not show that plaintiffs had lost profits. *See* Defs.' Reply in Supp. of Mot. for Summ. J. on Lost Profits, 13 MD 02432-RGS, dkt. no. 470, at 1, 5.

rulings. This would undermine the notion that an interlocutory appeal is supposed to be a rare event, reserved for unusual situations.

## Conclusion

For these reasons, the Court denies plaintiffs' motion to certify [dkt. no. 233].

Date: April 4, 2020

_____
MATTHEW F. KENNELLY
United States District Judge